Cesar ROMERO, M.D., Anthony Claxton, M.D., and David Korman, M.D., Appellants

v.

Joseph LIEBERMAN and John Lieberman, Individually and as Personal Representative of the Estate of Larry Lieberman, Deceased, Appellees.

No. 05–06–00810–CV.

Court of Appeals of Texas, Dallas.

Aug. 29, 2007.

David Grant Halpern, Asst. Atty. Gen., Austin, for appellants.

John Grost, El Paso, for appellees.

Before Justices MOSELEY, BRIDGES, and SMITH.[1]

## OPINION

Opinion by Justice MOSELEY.

Three physicians, Cesar Romero, M.D., Anthony Claxton, M.D., and David Kor-

---

1. The Honorable Bea Ann Smith, Retired, sit- ting by assignment.

man, M.D., filed this interlocutory appeal from the trial court's order denying their second objections and second motion to dismiss health care liability claims asserted against them by appellees Joseph Lieberman and John Lieberman, individually and as personal representative of the Estate of Larry Lieberman, Deceased. The physicians assert appellees failed to comply with the expert report requirements of section 74.351 of the civil practice and remedies code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351 (Vernon Supp.2006). In their first issue, they contend the trial court abused its discretion in denying their motion to dismiss because no report represented an objective good faith effort to meet the statutory requirements for an expert report. In their second issue, they contend the trial court erred in denying their objection to evidence attached to the expert report of Christina Cruz Grost, M.D. Appellees respond, in part, by asserting this court has no jurisdiction over this appeal.

For the following reasons, we conclude we have jurisdiction, resolve appellants' issues against them, and affirm the trial court's order.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Forty-year-old Larry Lieberman was transferred from the El Paso Psychiatric Center to Terrell State Hospital (TSH) on May 12, 2003. During his stay at TSH he was treated by the three physicians. Dr. Romero, a general practitioner with training in general surgery, was the TSH staff medical specialist. Dr. Claxton, a psychiatrist, was the medical director of TSH. Dr. Korman, a psychiatrist, was TSH's medical director of adult acute services and assistant clinical director.

Appellees alleged that Lieberman was ill from the evening of May 13, manifesting signs and symptoms of a severe medical illness, including respiratory distress, confusion, and renal failure. On May 15, about 2:15 p.m., he was sent to the emergency department of Terrell's Medical Center, where he died of sepsis at 5:41 p.m.

Appellees sued appellants, alleging Lieberman relied on them to provide him with proper and timely medical care and treatment. They alleged appellants negligently failed to make proper tests and examinations, to administer proper medications, to call in consultants, to recognize and treat the obvious signs of a serious illness, and to timely transfer Lieberman to a facility with the capabilities of treating his condition. Appellees alleged appellants' negligence caused Lieberman's death.

Appellees served the expert reports of Benjamin L. Portnoy, M.D. and Dr. Cruz Grost. Appellants filed "Objections and Motion to Dismiss." The trial court sustained their objections, found the expert reports inadequate, and granted appellees a thirty-day extension of time to cure the deficiencies. Appellees subsequently filed the revised expert reports of Dr. Portnoy and Dr. Cruz Grost. Appellants filed their Second Objections and Second Motion to Dismiss. Appellees filed a response. After a hearing, the trial court denied the Second Objections and Second Motion to Dismiss. This appeal followed.

## II. MEDICAL LIABILITY EXPERT REPORTS

Within 120 days of filing a lawsuit asserting a health care liability claim, a plaintiff must serve an expert report, with the expert's curriculum vitae, to each defendant against whom a liability claim is asserted. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a). An "expert report" means a written report by an expert that provides a fair summary of the expert's opinions as of

the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed. *Id.* § 74.351(r)(6). A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after a hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in subsection (r)(6). *Id.* § 74.351(*l*). If the plaintiff does not timely serve an expert report, the court must, on the affected defendant's motion, award attorney's fees and costs of court and dismiss the case with prejudice. *Id.* § 74.351(b).

### III. JURISDICTION

■ Appellees argue this Court lacks jurisdiction because the trial court's order is not an order from which an interlocutory appeal is authorized. The civil practices and remedies code provides for an interlocutory appeal from an order that denies all or part of the relief sought by a motion under section 74.351(b). *See id.* § 51.014(a)(9) (Vernon Supp.2006). In their Second Objections and Second Motion to Dismiss, the physicians challenged the adequacy of Dr. Portnoy's and Dr. Cruz Grost's expert reports, and sought the dismissal of appellees' causes of action with prejudice and an award of "fees and costs...."

Although the physicians' motion did not cite to section 74.351(b) specifically, that provision is the only basis for obtaining the relief requested. As the trial court's order denies that relief, we conclude it constitutes an order denying relief sought by a motion under section 74.351(b). Accordingly, we conclude this Court has jurisdiction under section 51.014(a)(9). *See id.*

§ 51.014(a)(9); *Cayton v. Moore,* 224 S.W.3d 440, 443–44 (Tex.App.-Dallas 2007, no pet.) (concluding section 51.014(a)(9) applies to interlocutory appeal of order denying motion to dismiss challenging adequacy of expert report under section 74.351(*l*) and urging failure to file adequate expert report grounds for dismissal under section 74.351(b)); *Methodist Healthcare Sys. of San Antonio, Ltd., L.L.P. v. Martinez–Partido,* No. 04–05–00868–CV, 2006 WL 1627844, at *1–2 (Tex.App.-San Antonio June 14, 2006, pet. filed) (mem. op.) (same); *see also HealthSouth Corp. v. Searcy,* No. 05–06–01537–CV, 228 S.W.3d 907, 908 (Tex.App.-Dallas 2007, no pet. h.) (relying on *Cayton* ); *but see Jain v. Stafford,* 214 S.W.3d 94, 97 (Tex.App.-Fort Worth 2006, pet. filed) (concluding order denying motion to dismiss based on alleged inadequacy of expert report not within either 51.014(a)(9) or (10)); *Acad. of Oriental Med., L.L.C. v. Andra,* 173 S.W.3d 184, 186–87 (Tex.App.-Austin 2005, no pet.).

### IV. ADEQUACY OF EXPERT REPORTS

In their first issue, appellants contend the experts' reports are deficient because they are conclusory.

### A. Applicable Law and Standard of Review

■ Under subsections 74.351(*l*) and (r)(6), the expert report must represent a good-faith effort to provide a fair summary of the expert's opinions. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878 (Tex.2001) (interpreting previous statute). A report must include the expert's opinion on each of the elements identified in the statute. *Id.* In setting out the expert's opinions on each of those elements, the report must provide enough information to fulfill two purposes

if it is to constitute a good-faith effort. First, the report must inform the defendant of the specific conduct the plaintiff has called into question. Second, and equally important, the report must provide a basis for the trial court to conclude that the claims have merit. *Id.* at 879. A report that merely states the expert's conclusions about the standard of care, breach, and causation does not fulfill these two purposes. *Id.*

██ We review a trial court's decision on a motion to dismiss under section 74.351 for an abuse of discretion. *See id.* at 875. A trial court abuses its discretion when it acts in an arbitrary and unreasonable manner or when it acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985). A trial court has no discretion in determining what the law is or applying the law to the facts. *See Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992) (orig. proceeding) (failure by trial court to analyze or apply law correctly constitutes abuse of discretion).

## B. Dr. Portnoy's Expert Report

Appellants argue Dr. Portnoy's expert report is conclusory for three reasons: (1) it fails to state a standard of care for each physician; (2) it fails to show how each physician breached the standard of care applicable to him; and (3) it fails to show how each alleged breach was the proximate cause of injury.

Dr. Portnoy's report stated he was a board certified specialist in internal medicine, had completed additional training in infectious diseases, and had practiced both internal medicine and the treatment of infectious diseases in Houston since 1976. Dr. Portnoy's report also stated he was often called upon to care for cases of sepsis; that his opinions are based on the records provided him, his education, training, and experience; and that his opinions are based on sound medical probability.

With respect to the standard of care, Dr. Portnoy's report states:

> In my opinion *the standard of care for the evaluation and treatment of the patient with septicemia or symptoms of septicemia is the same for all specialities. The standard of care is a national standard* and ordinarily would not vary from one locality to another.

(Emphasis added.)

Dr. Portnoy detailed Lieberman's condition during the course of his stay at TSH based on his medical records; he characterized Lieberman as exhibiting symptoms of sepsis: marked perspiration, rapid breaching, no urine output, and increased agitation and temperature elevation.[2] Dr. Portnoy's report also stated:

---

2. Specifically Dr. Portnoy's report stated:

On 5/14/2003 at 02:35, [Lieberman] was found to have a sheet wet with sweat, and he was found to have no urine output. At 02.50 his respiratory rate was recorded to be 84 per minute. The normal respiratory rate is under 20. Over the next hour, his respirations were noted to continue to be very fast (80 per minute), his sweating continued, and his temperature was slightly elevated to 99.3. At 04:00, a urinary catheter was placed, and only 220 cc of dark urine were obtained. Considering that he had consumed about 1300 cc of fluids, it

would be expected that there would be much more output, certainly over 500cc. At 11:00, he was moved to "Med 7," which I assume is a medical area. His blood pressure was significantly below normal at 83/55, his pulse was 101 and thready. At 13:50, his oxygen saturation was only 85% on room air, a very low level, and he was started on oxygen. He continued to have little urine output. His oxygen saturation only rose to 88% with oxygen administered at 2 liters/min. Thus it was below normal even with supplemental oxygen-normal being about 96%. On 5/15/2003 at 08:30, he

The standard of care for Mr. Lieberman required that sepsis be considered when he presented with marked perspiration, rapid breaching, no urine output and increased agitation and temperature elevation. The standard of care also required that once sepsis was considered a cause of his symptoms, urgent admission must have been arranged to an intensive care unit under the care of a physician trained to treat septicemia. From the medical records it appears that *the physicians caring for Mr. Lieberman on May 14th and May 15th were Drs. Anthony Claxton, Cesar Romero, and David Korman. Each had an opportunity to transfer Mr. Lieberman to an intensive care unit or* obtain an urgent consultation and failed to do so.

\* \* \*

At 02:35 on 5/14/2003, a drenching sweat and no urine output should have alerted the physician on call that Mr. Lieberman probably had a septic condition. A tentative diagnosis of sepsis mandates an immediate consultation with a physician familiar with the treatment of septicemia (internal medicine or pulmonary/intensive care physician) or transfer to a hospital capable of caring for a patient with sepsis. If such a consultation of transfer had been made, Mr. Lieberman would undoubtedly have been placed in an intensive care

had a fever of 100.7°F, his blood pressure remained low at 80/66, he had no urine output, and respirations were rapid at 56 per minute. His pulses were not palpable. At 13:45, a decision was made to transfer the patient to Medical Center of Terrell. At no time could it be said that Mr. Lieberman was improving or even holding his own. In fact his condition was deteriorating.

\* \* \*

Low blood pressure may be to due to vasodilatation of the vascular system secondary to infection or to dehydration or both. The treatment is fluid resuscitation and/or medications to raise the blood pressure. Inadequate fluids were given. No medications were given in an attempt to raise the blood pressure. With septicemia as a possible cause of the low blood pressure, antibiotics must be given-none were. A thready pulse is an indication of dehydration or vasodilatation. A pulse of 101 is another sign of dehydration or vasodilatation.

Low oxygen saturation is due to the inability of the body to absorb sufficient oxygen through the lungs. In an acute situation, the most likely cause is a pneumonia that may not show up on x-ray for a day or so. A patient can not maintain a respiratory rate of over 40 breaths per minute for more than a few hours due to fatigue. The treatment is to try to improve oxygenation by providing supplemental oxygen. If supplemental oxygen does not decrease the res-piratory rate to a level the patient can easily maintain (low 30s) the patient must be placed on a ventilator. No oxygen supplementation was given until 1:40 p.m. on the 14th when the oxygen saturation was noted to be 85% but the respiratory rate had fallen to 25. The respiratory rate of 25 in the face of an oxygen saturation of 85% strongly suggests the patient is in or getting into serious problems due to fatigue or acidosis or both.

Acidosis occurs due to a break down in metabolism of the body's ability to remove waste products. Metabolic waste is usually removed through breathing and through the kidneys. Mr. Lieberman was showing serious problems with both his lungs and his kidneys as early as 02:35 on May 14th.

Mr. Lieberman was pronounced dead about 3 hours later at Medical Center of Terrell....

On 5/15/2003 at 8:30 the next morning, Mr. Lieberman had cardinal symptoms of septic shock: low blood pressure, fever, rapid respirations, and no urine output. No diagnostic considerations were made, and no proper treatment was rendered. Even at this late point in the course of illness, had treatment been given, Mr. Lieberman would have had a chance of recovery although less than it would have been earlier. Treatment would be as set out above-more oxygen, more fluids, culture and IV antibiotics, and rapid transfer to an intensive care unit.

unit for monitoring of his oxygenation and for the presence of acidosis. He would have had cultures done of his blood and hand. Antibiotic treatment would have been started. In all reasonable medical probability he would very likely have survived as Group A Streptococcus is sensitive to a broad array of antibiotics, and almost any antibiotic would have been effective. Since Mr. Lieberman survived until 5:00 p.m. on May 15th with totally inadequate care (no antibiotics, too little oxygen, too little fluids, no medications to maintain blood pressure and no monitoring for acidosis) if he had been transferred to Terrel[l] Medical Center and given the proper support within twenty-fours [sic] of the onset of symptoms, it is my opinion that his chances of survival were greater than 50%.

At 13:50 on 5/14/2003 when he was found to have low oxygen, no attempt was made to find a cause for this condition. At 21:45 on 5/14/12003, he was found to remain low in oxygen even with supplementary oxygen administered and he was found to have no urine output. Had sepsis, a common cause of these problems, been considered and treated, Mr. Lieberman would have had a chance of survival that exceeded 50% at this time. No evaluation was done and no treatment rendered. The standard of care was to increase the supplemental oxygen, increase the IV fluids, cultures, antibiotics and immediate transfer to an intensive care unit. None of this done....

\* \* \*

*The standard of care for Drs. Cesar Romero, Anthony Claxton and David Korman required that Mr. Lieberman be placed in an intensive care unit so that he good [sic] receive adequate oxygenation, adequate fluids, monitoring and treatment of his acidosis, and anti-biotics. None of this care was provided.* Ferri's Clinical Advisor p. 436, "Septicemia," 1999 edition (attached to Dr. Crus' [sic] report) correctly outlines the standard of care for a patient like Larry Lieberman[ ] for May 2003.

The lack of treatment of group A streptococcal sepsis directly resulted in the death or [sic] Mr. Lieberman. His care at Terrell State Hospital fell well below the standard of care for treatment in such cases. *If Mr. Lieberman had been diagnosed and treated in a timely manner, by either Doctor Cesar Romero, Anthony Claxton or David Korman, working together or separately, he would have in all medical probability survived.* But, at Terrell State Hospital, barely any diagnostic studies were done, serious signs of illness were ignored, and no antibiotic treatment was ever begun. By the time he was transferred out of TSH, there was almost no chance to successfully treat him.

(Emphasis added.)

Dr. Portnoy also stated that he had reviewed Lieberman's autopsy report, which indicated Lieberman died of sepsis due to group A streptococcus. In addition, the autopsy report notes gangrenous changes on Lieberman's hands and right knee; streptococcus was cultured from the right hand; and both pneumonia and kidney infection were found.

■ Appellants contend that Dr. Portnoy's expert report does not articulate a standard of care for each of them. They also contend that his statement that "the standard of care for the evaluation and treatment of the patient with septicemia or symptoms of septicemia is the same for all specialties" is conclusory and a "one size fits all" standard. We disagree. Dr. Portnoy stated a standard of care for any medical doctor as to the recognition and

treatment of the "cardinal symptoms of septic shock" displayed by Lieberman. All of these doctors participated in treating this condition. *See In re Stacy K. Boone, P.A.*, 223 S.W.3d 398, 405–06 (Tex.App.-Amarillo 2006, orig. proceeding) (discussing standard of care applicable to all defendants involved in administration of treatment).

Likewise, Dr. Portnoy names the individual treating doctors and states how the conduct of each fell below the standard of care. Thus these circumstances are unlike those in *Sandles v. Howerton*, 163 S.W.3d 829, 835 (Tex.App.-Dallas 2005, no pet.), and *Taylor v. Christus Spohn Health System Corp.*, 169 S.W.3d 241, 244–46 (Tex. App.-Corpus Christi 2004, no pet.), on which appellants rely. In *Sandles*, the expert report failed to name individual care-givers for the most part, and stated the conduct of a named individual without stating the standard of care relating to him and how he failed to provide that care. In *Taylor*, the defendants included a hospital, a doctors' association, an emergency room physician, and a cardiologist, and the expert failed to state what each defendant should have done to meet the standard of care, and failed to do, and how the failure led to the patient's death.

Here, Dr. Portnoy named the individuals and stated what standard of care treating doctors should provide and how these treating doctors failed to provide that care. Because Dr. Portnoy offered a reasoned basis for his opinions as to the statutory elements, we reject appellants' arguments that the report is conclusory. *See Burrow v. Arce*, 997 S.W.2d 229, 236 (Tex.1999) (opinion with reasoned basis not conclusory).

Finally, we conclude appellants' reliance on *Olveda v. Sepulveda*, 141 S.W.3d 679, 682 (Tex.App.-San Antonio 2004), *pet. denied*, 189 S.W.3d 740 (Tex.2006), is mis-

placed. That case concerned whether the expert's report included the qualifications of the expert, an obstetric anesthesiologist, to testify to the standard of care for a urologist in diagnosing preeclampsia. The San Antonio Court of Appeals opined that it was not enough for the anesthesiologist to state that all physicians should be able to diagnose preeclampsia. *See id.* Rather, the expert was required to show how she had the "knowledge, skill, experience, training, or education" regarding the standard of care applicable to urologists qualifying her to give an opinion on that particular subject. *Id.; see Broders v. Heise*, 924 S.W.2d 148, 151 (Tex.1996).

Here, Dr. Portnoy's report and CV demonstrate his qualifications as a specialist in internal medicine and infectious diseases. The report stated that "the standard of care for the evaluation and treatment of the patient with septicemia or symptoms of septicemia is the same for all specialities" and that "[t]he standard of care is a national standard and ordinarily would not vary from one locality to another." Unlike the expert report in *Olveda*, Dr. Portnoy's report and CV shows his qualifications to state the standard of care as to the evaluation and treatment of septicemia by all medical doctors.

We conclude that Dr. Portnoy's expert report meets the *Palacios* analysis: it informed each defendant of the specific conduct appellees called into question and provided a basis for the trial court to conclude that the claims have merit. *See Palacios*, 46 S.W.3d at 878. It does not merely state Dr. Portnoy's conclusions about the statutory elements of an expert report. *See id.* Accordingly, we conclude it appears the report represents an objective good faith effort to comply with the definition of an expert report. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(6). We further conclude the trial court did not

abuse its discretion in denying appellants' motion challenging the adequacy of Dr. Portnoy's expert report. *See id.* § 74.351(*l* ). We decide appellants' first issue against them to this extent.

## C. Dr. Cruz Grost's Expert Report

■ Appellants argue that Dr. Cruz Grost's expert report is inadequate because it is conclusory in the same way as Dr. Portnoy's: it failed to state the standard of care, how appellants breached it, and how the breaches caused Lieberman's death.

In her report, Dr. Cruz Grost stated she is a board certified psychiatrist, licensed and practicing psychiatry in Texas. She stated she reviewed the medical records form TSH and Lieberman's autopsy report. Further, she outlined Lieberman's symptoms beginning at 2:35 a.m. on May 14, 2003, and stated, in part:

> The standard of care for psychiatrists or physicians having the responsibility of caring for a patient such as Larry Lieberman in a psychiatric hospital or any other type of hospital in the U.S. medical world is the same. In other words, the method of evaluation and treatment for septicemia would not vary from specialty to specialty.

The standard of care required by the physicians caring for Mr. Lieberman at [THS], Drs. Anthony Claxton, Cesar Romero, and David Korman, to recognize that the symptoms of minimal urinary output, intense perspiration, rapid breathing, and temperature elevation were indicative of septicemia. This is a national standard. (See Ferri's Clinical Advisor, p. 436, "Septicemia" attached.) Drs. Claxton, Romero and Korman failed to meet this standard of care in that they failed to recognize and document that septicemia was a consideration.

\* \* \*

Psychiatrists are trained in the recognition of septicemia as septic patients can present with symptoms that mimic mental illness. But psychiatrists are not typically trained to treat septicemia. The national standard of care required that Mr. Lieberman be placed in an intensive care setting and that he be cared for by physicians experienced in the treatment of septicemia. The physicians caring for Mr. Lieberman breached this standard of care. These physicians were Drs. Anthony Claxton, Cesar Romero and David Korman.

\* \* \*

It is also my opinion based on the autopsy report (attached) that the cause of Mr. Lieberman's death was septicemia due to Group A *Streptococcus.*

Because, like Dr. Portnoy, Dr. Cruz Grost provided a reasoned basis for her opinions as to each of the statutory elements, we reject appellants' argument that her expert report was inadequate because it was conclusory in the same way as Dr. Portnoy's. *See Palacios,* 46 S.W.3d at 879; TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6).

■ Next, appellants argue that Dr. Cruz Grost's expert report failed to show her qualifications to articulate the standard of care. Specifically, they contend that Dr. Cruz Grost's qualifications are not in her report or in her CV (which was not challenged below). Section 74.401(a) provides that, in a suit involving a health care liability claim against a physician for injury to or death of a patient, a person may qualify as an expert witness on the issue of whether the physician departed from accepted standards of medical care only if the person is a physician who: (1) is practicing medicine at the time such testimony is given or was practicing medicine at the

time the claim arose; (2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care. TEX. CIV. PRAC. & REM.CODE ANN. § 74.401(a). Section 74.401(c) provides that, "[i]n determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness: (1) is board certified ...; and (2) is actively practicing medicine in rendering medical care services relevant to the claim." *Id.* § 74.401(c). Both the report and CV show Dr. Cruz Grost was qualified to testify as an expert, including that she was board certified in psychiatry and actively practicing psychiatry on the date of her expert report. We conclude Dr. Cruz Grost's qualifications pursuant to section 74.401(a) and (c) were shown in her report and CV.

Accordingly, we conclude it appears Dr. Cruz Grost's report represented an objective good faith effort to comply with the definition of an expert report. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6). Thus the trial court did not abuse its discretion in denying appellants' motion challenging the adequacy of Dr. Cruz Grost's expert report. *See id.* § 74.351(*l*). We resolve their first issue against them to this extent.

Accordingly, we conclude the trial court did not abuse its discretion in denying appellants' motion to dismiss on grounds that no expert report satisfying the requirements of section 74.351 had been filed. We resolve appellants' first issue against them.

## V. OBJECTION TO EVIDENCE

In their second issue, appellants contend the trial court erred in denying their objection to "Ferri's Clinical Advisor, Septicemia" attached to Dr. Cruz Grost's expert report. Appellants argue "the law does not allow [Dr.] Cruz Grost to establish through others what her qualifications do not." Appellants contend Dr. Cruz Grost relied on the attachment to show how she arrived at the standard of care. *See Palacios,* 46 S.W.3d at 878 (information relevant to whether expert report meets statutory requirements is only within four corners of document).

The attachment is a one-page "instant diagnosis and treatment" guide for physicians. Dr. Cruz Grost's report and CV show her qualifications, and the report itself stated the standard of care for the treating physicians: recognition of the described symptoms of septicemia and placement with experienced physicians. Accordingly, the attachment is immaterial to the complaints on appeal regarding Dr. Cruz Grost's qualifications and the adequacy of the report. Thus, even assuming the trial court erred in denying appellants' objection, they cannot show harm. *See* TEX.R.APP. P. 44.1 (error reversible when it probably caused rendition of improper judgment or probably prevented appellant form property presenting case to appellate court). Accordingly, we resolve appellants' second issue against them.

## VI. CONCLUSION

Having resolved appellants' two issues against them, we affirm the trial court's order denying their second objections and second motion to dismiss.