Jeff **LIVINGSTON, M.D.**, Lisa Jukes, **M.D.**, and Scharlene Jones, **R.N.**, Appellants,

v.

Angle **MONTGOMERY** and Jerry Coulter, as Parents and Next Friend of Travis Colter, a Minor, Appellees.

No. 05–08–00031–CV.

Court of Appeals of Texas, Dallas.

Feb. 27, 2009.

Rehearing Overruled April 1, 2009.

Michael A. Yanof, Stinnett, Thiebaud & Remington, L.L.P., Phillipa M. Remington, Brenda Neel Hight, Fletcher, Farley, Shipman & Salinas, LLP, Stephen G. Good, Kenneth J. Lambert, Fletcher, Farley, Krueger, Shipman & Salinas, LLP, Dallas, TX, for appellants.

Jacquelyn C. Gregan, Haskins & Gregan, Joshua Davis, Houston, TX, for appellees.

Before Justices WRIGHT, LANG–MIERS, and MAZZANT.

## OPINION

Opinion by Justice LANG–MIERS.

This is an interlocutory appeal. Appellants, two doctors and one nurse, challenge the trial court's order denying their motion to dismiss medical malpractice claims filed by appellees. Appellants argue that appellees' expert's reports do not comply with the requirements of chapter 74 of the Texas Civil Practice and Remedies Code because the expert identifies one standard of care for more than one defendant and does not demonstrate that he is qualified to provide an opinion about the cause of the alleged injuries. We overrule appellants' two issues and affirm the trial court's order.

### BACKGROUND

Appellees are the parents of Travis Colter. They sued five doctors and four nurses, including appellants, alleging that Travis suffered severe neurological injuries as a result of medical malpractice committed during his mother's labor and delivery. In their petition, appellees allege that the following acts constitute negligence on the part of the doctors:

1. Failure to intervene in the face of fetal distress on non-reassuring fetal heart rate patterns;
2. Failure to discontinue use of Oxytocin (Petocin) in the presence of non-reassuring fetal heart tones;
3. Failure to discontinue use of Oxytocin (Petocin) in the presence of hypertonic labor;
4. Delay in the decision to perform a Caesarean section; and
5. Delay in performing a Caesarean section.

And appellees allege that the following acts constitute negligence on the part of the nurses:

1. Failure to adequately/properly monitor fetal well-being;
2. Abuse of the drug Petocin during labor;
3. Failure to intervene in [the] face of fetal distress on non-reassuring fetal heart rate patterns;
4. Failure to summon a resuscitation team in a timely manner; and
5. Delayed resuscitation to distressed newborn baby without a respiratory rate.

Appellees served the defendants with the expert report of Dr. Gerald M. DiLeo, an OB/GYN. Appellants filed individual motions to dismiss, in which they asserted multiple objections to DiLeo's report. Before the hearing on appellants' motions, and before their 120–day deadline under chapter 74, appellees served appellants with two supplemental expert reports from DiLeo. Appellants supplemented their motions to dismiss in response to the new reports. After a hearing, the trial court denied the motions to dismiss.

### APPLICABLE LAW

Chapter 74 of the civil practice and remedies code requires a claimant pursuing a health care liability claim to serve one or more expert reports on each party no later than 120 days after the original petition is filed. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (Vernon Supp.2008). An "expert report" is defined as

a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure

and the injury, harm, or damages claimed.

*Id.* § 74.351(r)(6).

■ A court shall grant a motion challenging the adequacy of a report only if the report "does not represent an objective good faith effort to comply" with the definition of "expert report" in the statute. *Id.* § 74.351(*l*). To constitute a good faith effort, the report must provide enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question, and (2) it must provide a basis for the district court to conclude that the claims have merit. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002) (citing *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 879 (Tex.2001)). The Texas Supreme Court has also stated that a report need not marshal all of the claimant's proof, but it must include the expert's opinion on each of the elements identified in section 74.351. *Palacios,* 46 S.W.3d at 878.

## STANDARD OF REVIEW

■ We review a trial court's ruling on a motion to dismiss under section 74.351 for an abuse of discretion. *Palacios,* 46 S.W.3d at 877–78. A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985). A trial court does not abuse its discretion

simply because it may decide a matter within its discretion differently than an appellate court. *Id.* at 42. However, a trial court has no discretion in determining what the law is or applying the law to the facts. *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992). A clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion. *Id.* But we defer to the trial court on close calls concerning an expert's qualifications. *See Larson v. Downing,* 197 S.W.3d 303, 304–305 (Tex.2006).

## ANALYSIS

Appellants argue that DiLeo's three reports "do not fulfill the statutory requirements for an 'expert report' as a matter of law" and challenge DiLeo's reports on two grounds. First, appellants argue that DiLeo's reports improperly "addressed the alleged failures of the medical team collectively." Second, appellants argue that DiLeo's report does not establish that he is qualified to opine "as to causation of neurological injuries." We analyze these two issues separately.

## Are DiLeo's reports inadequate because he identifies one standard of care for more than one defendant?

■ Appellants argue that DiLeo was required to "explain how each defendant breached the applicable standard of care and how each defendant's breach caused injury." Appellants claim that DiLeo did not satisfy this requirement because he "lumped together" all of the doctors and all of the nurses.[1] Appellants claim that

1. DiLeo's reports state the following standard of care for the defendant doctors:

The standard of care called for Drs. Livingston, Jukes, Morse, Purcell, and Casey to be aware of recurrent episodes of non-reassuring fetal heart patterns and appreciate such patterns as the unborn baby's inability to tolerate labor, and to effect timely delivery via Cesarean Section when vaginal delivery was not imminent. Meconium evidence of fetal stress should have further underscored

the urgency to act. The presence of these two complications, non-reassuring fetal heart rate rhythms and meconium, are self-corroborating and obvious as to their significance.

The standard of care also called for Drs. Livingston, Jukes, Morse, Purcell, and Casey to stop uterine stimulation by immediately discontinuing oxytocin in the presence of these episodes of non-reassuring fetal heart patterns, hyperstimulated labor, and

DiLeo's reports read "as if there were two persons at the delivery—one doctor (with five names) and one nurse (with four names)." They cite *Taylor v. Christus Spohn Health System, Corp.*, 169 S.W.3d 241 (Tex.App.-Corpus Christi 2004, no pet.), and argue that the trial court should not have permitted DiLeo to identify one standard of care for more than one defendant. In response, appellees argue that *Taylor* is distinguishable. We agree with appellees.

In *Taylor* the expert report addressed the conduct of several different categories of health care providers—including a hospital, a doctor's association, and an emergency room doctor. Although the expert concluded that each of the defendants was negligent, he did not differentiate between the different categories of health care pro-

viders or "present the standards of care relevant to each [defendant]." *Id.* at 245. The *Taylor* court did not hold that the same standard of care could not apply to more than one defendant; it essentially explained that when a health care liability claim is brought against different categories of health care providers, an expert report must identify the particular standard of care that applies to each category.

More analogous to this case is *Romero v. Lieberman*, 232 S.W.3d 385 (Tex.App.-Dallas 2007, no pet.). In *Romero* the patient whose treatment was at issue died of sepsis and the defendant health care providers were his three treating doctors—two psychiatrists and a general practitioner with training in general surgery. The plaintiffs' experts identified one standard of care for all three doctors and explained

meconium, and effect Cesarean rescue of the unborn baby who was not tolerating labor and who was remote from imminent vaginal delivery.

And his reports state the following standard of care for defendant nurses:

The standard of care called for the nurses, [including] Scharlene Jones, at Parkland Medical Center[,] to recognize the non-reassuring fetal heart patterns at these times: [lists specific times] and to stop uterine stimulation by immediately discontinuing oxytocin in the presence of these episodes of non-reassuring fetal heart patterns ... and when associated with hyperstimulated labor.

The standard of care called for nurses [including] Scharlene Jones, at Parkland Medical Center[,] to notify the attending obstetrician of continued non-reassuring fetal heart rate patterns, as above, and anomalous labor patterns, as above, and to discontinue or refuse the physician-ordered continued labor augmentation which is against the standard nursing and hospital protocol that called for cessation of augmentation with these conditions.

Also, although there were many episodes of non-reassuring fetal heart rate patterns, it is my opinion that the episode on April 22, 2000, from 01:30–01:45 ... which demonstrated recurrent late and severe variable

decelerations with slow return to baseline, and which followed three intrauterine resuscitation interventions implemented by the nurses, constituted a Seminal Event which obligated them to act as their unborn patent's advocate to notify the nursing supervisor to address a situation wherein an unborn infant was demonstrating intolerance to labor without Cesarean rescue and where this infant was additionally challenged further with augmentation of labor, remote from delivery and with meconium evidence of fetal distress.

Although a nurse is not the treating physician, he or she is an integral part of the "team" effort necessary to render the standard of such combined care. He or she has an obligation to act as his or her patient's advocate. The standard of care in situations such as Ms. Montgomery's called for nurses to recognize the presence of non-reassuring fetal heart rates, especially when complicated by meconium, institute resuscitative measures, and discontinue oxytocin. They have the added obligation to notify the nursing chain of command when such danger, as with Ms. Montgomery's unborn child, continues without being effectively addressed, i.e., discontinuing the augmentation orders contraindicated by the above conditions, or without effective remedy, i.e., Cesarean rescue.

that the same standard applied to each of them. The defendants argued on appeal that the plaintiffs' expert reports were conclusory because they identified one standard of care for more than one doctor. We disagreed and concluded that the trial court did not abuse its discretion when it concluded that the expert reports represented a good faith effort to comply with the definition of an expert report because the reports named the individuals whose conduct was at issue and stated what standard of care applied to them, which was the same standard for all three treating physicians. *Romero,* 232 S.W.3d at 389–94.

In this case, Livingston and Jukes were two of the doctors who attended, and Jones was a nurse who assisted with, Montgomery's labor and delivery. DiLeo's report identifies the standard of care that applied to the doctors who attended Montgomery during her labor and delivery, and separately identifies the standard of care that applied to the nurses who assisted with Montgomery's labor and delivery. He also explains what he contends each of them failed to do. Consequently, the fact that he identifies one standard of care for more than one defendant does not render DiLeo's reports deficient under chapter 74. *See id.* at 392–94; *Springer v. Johnson,* No. 07–07–00424–CV, 2008 WL 2346385, at *8, 280 S.W.3d 322, 332 (Tex. App.-Amarillo June 4, 2008, no pet.). We overrule appellants' first issue.

### Is DiLeo qualified to opine about the cause of a newborn's neurological injuries?

Appellants do not challenge DiLeo's qualifications as an OB/GYN, and they do not argue that DiLeo was not qualified to opine about the standards of care that apply in this case. But in their second issue, appellants argue that all of the claimed injuries are neurological injuries and that DiLeo's reports do not satisfy the

requirements of sections 74.351(r)(5)C) and 74.403(a) because the reports do not demonstrate that he is qualified "to opine as to causation of neurological injuries or conditions—much less pediatric neurological injuries."

To qualify as an expert witness on the issue of cause of injury, harm, or damages in a health care liability claim under section 74.351(r)(5)(C), an expert must be "a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence." Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(5)(C). Likewise, under section 74.403(a), "a person may qualify as an expert witness on the issue of the causal relationship between the alleged departure from accepted standards of care and the injury, harm, or damages claimed only if the person is a physician and is otherwise qualified to render opinions on that causal relationship under the Texas Rules of Evidence." *Id.* § 74.403(a). Texas Rule of Evidence 702 requires an expert witness to be qualified on the basis of "knowledge, skill, experience, training, or education." Tex.R. Evid. 702.

DiLeo's reports include the several paragraphs describing his expertise and qualifications as follows:

I am a board-certified OBGYN in private practice in Mandeville, La., since 1982. I was board certified in 1987 and 1997 for ten year terms, and I am currently (2007) changing to annual board certification as maintenance of my continuity of board certification. In August, 2007, I began my position as Assistant Professor of OB–GYN at University of South Florida in Tampa, Florida.

. . .

As a board certified obstetrician-gynecologist who has had primary responsibilities in managing labor and delivery, I

feel qualified to opine on the above failings of Drs. Livingston, Jukes, Morse, Purcell, and Casey. Having trained at Charity Hospital of Louisiana in New Orleans, a large, "high traffic" tertiary facility, I have been exposed to the volume and diversity of patients, their conditions, and complications. For this reason, I feel qualified to opine on Ms. Montgomery's care and complications in her locale. I feel qualified to opine that the standard of care that was a part of my training and continued as the standard of care in my subsequent private practice is no different from the standard of care at Parkland Medical Center.

Although I am not a neurologist, as an obstetrician I have knowledge and expertise to recognize the perinatal progression of hypoxia due to inadequate oxygenation through a compromised uteroplacental unit—either because of uteroplacental insufficiency or inadequate refractory periods between contractions or both; I have knowledge and expertise on the subject of hypoxia as it relates to the associated build up of carbon dioxide (hypercapnia) that complicates ischemia and which makes the unborn infant at risk for a rebound brain perfusion that results in perinatal neurological brain injury. Mrs. Montgomery's newborn had blood gas determinations that documented acidosis, hypoxia, and hypercapnia.

The infant had fetal compromise (intolerance to labor), APGAR of 3 at one minute of age, and required high ventilator settings well into the neonatal periods. These conditions indicate an intrapartal causation of injuries.

Appellants acknowledge that physicians who are not neurologists but have "extensive expertise in neurological matters" may be qualified to testify as to the cause of neurological injuries. They argue, however, that Di Leo's reports do not demonstrate that he qualifies to give his opinion as an expert about the cause of Travis's injuries. Conversely, appellees argue that DiLeo is qualified to give his opinion as an expert about what caused Travis's injuries, "to make this logical leap-oxygen deprivation in utero causes brain injury," because of his experience and training.

Appellants and appellees both cite to *Roberts v. Williamson*, 111 S.W.3d 113 (Tex.2003). One of the issues the court addressed in *Roberts* is "whether a medical expert, who is not a neurologist, is nevertheless qualified to testify about the cause . . . of a child's neurological injuries." *Roberts*, 111 S.W.3d at 116. There, parents sued a pediatrician, Dr. Karen Roberts (among others), claiming their one-day-old child suffered brain damage because a ventilator malfunctioned and defendants failed to properly treat and then transfer the child to a better-equipped hospital. At trial, the parents' expert, a board-certified pediatrician, Dr. Frank McGehee, testified that Roberts's negligence proximately caused the child to suffer substantial neurological injuries. McGehee testified that he was a board-certified pediatrician who held certifications in pediatric advanced life-support and advanced trauma life-support, he had studied the effects of pediatric neurological injuries, and he had extensive experience advising parents about the effects of these types of injuries. McGehee also testified that he consulted several peer-reviewed medical-journal articles and textbooks on pediatric neurology, and based his opinions on his review of diagnostic test results, MRIs and CT scans, and the interpretation of those tests by a pediatric neurologist whose qualifications were not challenged by Roberts. On appeal, Roberts argued that McGehee was not qualified to testify about the cause and effect of the child's neurological injuries. The supreme court held that the trial court did not err

in admitting McGehee's testimony because, although he was not a neurologist, the record reflected that McGehee had experience and expertise regarding the specific causes and effects of the child's neurological injuries. *Id.* at 121–22.

Appellants also argue that this case is analogous to *Broders v. Heise,* 924 S.W.2d 148 (Tex.1996). The supreme court explained *Broders* in its opinion in *Roberts* as follows:

> In *Broders,* the trial court excluded expert testimony from an emergency-room physician who was prepared to testify about the cause of death in a medical malpractice action. The patient had suffered a head injury during an assault and was thereafter admitted to a hospital for observation and treatment. The patient was released the next day by her attending physician but returned to the hospital a few hours later, complaining of an intense headache, nausea, and sensitivity to light. A neurosurgeon examined her this time and determined that she had a fractured skull, with bleeding and swelling in the brain. The swelling could not be controlled, and the patient died the next day.
>
> The decedent's parents brought a wrongful death action against the hospital and three doctors. The defendants argued that the assault had caused an irreversible, untreatable, and fatal brain injury. No treatment, they said, whether negligent or not, could have been a cause in fact of the patient's death. The defendants presented expert testimony from two neurosurgeons to support their position. The plaintiff's expert would have testified that had the patient's head trauma been promptly diagnosed and treated during her first hospitalization, the patient would, in all medical probability, have survived. The court of appeals reversed and remanded, concluding that the trial court had erred in excluding this testimony.
>
> We held that the trial court had correctly excluded this testimony because the emergency-room physician was not qualified as an expert under Rule 702 "on the issue of cause in fact." While the emergency-room physician "knew both that neurosurgeons should be called to treat head injuries and what treatments they could provide, he never testified that he knew, from either experience or study, the effectiveness of those treatments in general, let alone in this case." We further observed that a medical license does not automatically qualify the holder "to testify as an expert on every medical question." But we likewise rejected the notion "that only a neurosurgeon can testify about the cause-in-fact of death from an injury to the brain, or even that an emergency room physician could never so testify." Rather, we stated the test to be whether "the offering party [has] establish[ed] that the expert has 'knowledge, skill, experience, training, or education' regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject."

*Roberts,* 111 S.W.3d at 121 (internal citations omitted).

■ Appellants argue that, like the expert in *Broders,* DiLeo did not demonstrate that he is qualified to opine on causation because his reports "failed to provide any information which would in any way qualify him to opine as to causation of neurological injuries or conditions— much less pediatric neurological injuries or conditions." We do not agree.

The overriding standard established in *Broders* was "whether the offering party [has] establish[ed] that the expert has 'knowledge, skill, experience, training, or education' regarding the specific issue before the court which would qualify the expert to give an opinion on that particular

subject." *Broders*, 924 S.W.2d at 153 (citations omitted). Our sister courts have applied the *Broders* standard to determine whether a non-neurologist was qualified under chapter 74 to provide an expert report on the cause of neurological injuries. In *Sloman–Moll v. Chavez*, No. 04–06–00589–CV, 2007 WL 595134 (Tex.App.-San Antonio Feb. 28, 2007, pet. denied) (mem.op.), parents sued Dr. Erik Sloman–Moll, an otolaryngologist they claimed negligently treated their minor son. The parents served an expert report prepared by Dr. Eugene Alford, also an otolaryngologist, in which Alford opined that the child suffered neurological injuries as a result of infections he contends were caused by Sloman–Moll's inadequate care after the child's endoscopic sinus surgery. Sloman–Moll challenged the adequacy of Alford's report, including his qualifications to render opinions regarding the cause of the child's claimed neurological injuries. The trial court denied Sloman–Moll's motion to dismiss and he appealed. On appeal, the court summarized the evidence in Alford's report and curriculum vitae concerning his specific training, experience, and special knowledge "on the subject of endoscopic sinus surgery." *Id.*, 2007 WL 595134, at *3. The court then explained that "[i]t is axiomatic that a physician trained to perform surgery is also trained to manage surgical complications." *Id.*, 2007 WL 595134, at *4 (citing *Keo v. Vu*, 76 S.W.3d 725, 733 (Tex.App.-Houston [1st Dist.] 2002, pet. denied)). And because it determined that Alford's expertise as a surgeon "also qualifies him to opine on the cause in fact of postoperative complications that flow from that surgery," our sister court concluded that it could not say that the trial court abused its discretion by allowing Alford to render an opinion in his expert report on causation. *Id.*, 2007 WL 595134 at *4.

Similarly, in *Comstock v. Clark*, No. 09–07–00300–CV, 2007 WL 3101992 (Tex.

App.-Beaumont 2007, pet. denied) (mem. op.), a patient and her parents sued a dental surgeon for malpractice claiming that she suffered permanent brain damage because of an overdose of sedation medication during dental surgery. The defendants argued that an anesthesiologist was not qualified as an expert regarding the cause of her injury because he was not a neurologist, a neurosurgeon, or a specialist in brain disorders. That court concluded otherwise:

> Dr. Orr's causation opinion is premised on the proposition that a significant deprivation of oxygen to the brain causes brain damage, and that Megan, as a result of sedation, suffered from a significant deprivation of oxygen. Because Dr. Orr's qualifications reflect that he is educated, trained, and experienced in anesthesiology, he is qualified to express the general opinion that a significant deprivation of oxygen causes brain injury.

*Comstock*, 2007 WL 3101992, at *4.

Additionally, in *Mosely v. Mundine*, 249 S.W.3d 775 (Tex.App.-Dallas 2008, no pet.), we applied the *Broders* standard to determine whether an expert was qualified to opine about the cause of injury. The patient and her husband claimed that the doctor who treated her in the emergency room after a car accident was negligent because the doctor did not detect and notify the patient about an abnormality in her x-ray that would have lead her to learn she had lung cancer. The cancer was detected several years later. The patient claimed that if the cancer had been detected earlier the treatment would have been less invasive and her life expectancy would have increased. The doctor defendant challenged the report of the plaintiffs' expert, arguing that he was not qualified to render opinions about the cause of injury because he was an internist and emergency room

877

physician and that the patient's injuries involved the treatment and prognosis for cancer, which is typically treated by an oncologist. We concluded that the report satisfied the requirements of chapter 74, stating:

> The conduct causing the [plaintiffs'] injuries related to the ability of an emergency room physician to interpret a routine chest x-ray and identify an abnormality, not the diagnosis and treatment for cancer. The record shows the trial court could have concluded the [plaintiffs] met their burden to prove [the expert] had the knowledge, skill, experience, training, or education regarding that specific emergency room physician's scope of practice.

*Mosely*, 249 S.W.3d at 779.

We conclude that this case is analogous to *Mosely*. The issue here is not who is qualified to testify about whether a neurologist could have saved the patient's life by treating her neurological injuries as in *Broders*. Instead, as in *Mosely*, the causation issue here relates to the duty of health care providers to recognize potential harm and take appropriate actions. DiLeo's expertise on the standard of care is uncontested. And he states that he has "knowledge and expertise to recognize the perinatal progression of hypoxia due to inadequate oxygenation through a compromised uteroplacental unit" and that Travis's conditions "indicate an intrapartal causation of injuries"—meaning they indicate that they were caused during labor and delivery. Paraphrasing the court in *Sloman–Moll*, DiLeo is an expert in managing labor and delivery, and his expertise qualifies him to opine on the causal relationship between labor and delivery and the complications that stem from labor and delivery, including a newborn's neurological injuries.

We conclude that the trial court did not act in an arbitrary or unreasonable manner or without reference to any guiding rules or principles and that the trial court could have reasonably concluded that DiLeo had the knowledge, skill, experience, education or training to render a causation opinion under rule 702 and section 74.351. As a result, we cannot say that the trial court abused its discretion when it concluded that DiLeo was qualified to opine about the cause of the alleged injuries in this case. And we cannot say that the trial court abused its discretion when it concluded that his reports constituted an objective, good-faith effort to comply the requirements of chapter 74. *See Bowie Mem'l*, 79 S.W.3d at 52.

### CONCLUSION

We overrule appellants' two issues and affirm the trial court's order.