

## MEMORANDUM OPINION

No. 04-08-00841-CV

Timothy **OSONMA**, M.D., and IPC The Hospitalist Co., Inc. ,
Appellants

v.

Cathy L. **SMITH**, Individually and as Representative
of the Estate of Bobby Jack Smith, deceased,
Appellee

From the 150th Judicial District Court, Bexar County, Texas
Trial Court No. 2008-CI-00951
Honorable Karen Pozza, Judge Presiding

Opinion by:    Karen Angelini, Justice

Sitting:       Karen Angelini, Justice
               Steven C. Hilbig, Justice
               Marialyn Barnard, Justice

Delivered and Filed:   July 1, 2009

AFFIRMED

Timothy Osonma, M.D., and his employer, IPC The Hospitalist Co, Inc. ("IPC"), appeal the

trial court's interlocutory order denying their motion to dismiss the health care liability claims

asserted against them in the underlying lawsuit. We affirm the order of the trial court.

## BACKGROUND

On November 25, 2006, forty-one-year-old Bobby Jack Smith was admitted to Methodist Hospital from the emergency department after a traumatic amputation of his right thumb. That same day, Dr. David Person, a hand surgeon, performed a five-hour surgery to reattach Smith's thumb. Following surgery, Smith was admitted to the Surgical Intensive Care Unit, and SICU admission orders included a heparin drip as well as aspirin. On November 26, 2006, the nursing admission assessment noted that Smith had risk factors for deep venous thrombosis and pulmonary embolism, including surgery, trauma, and being more than forty years of age. At 11:20 p.m., Dr. Person noted that the re-implanted thumb had undergone progressive venous congestion and arterial thrombosis. Dr. Person scheduled amputation of the thumb for the following day. The next day at 8:00 a.m., Dr. Person ordered the heparin stopped. That same day, Dr. Person operated again on Smith, performing a right thumb amputation with flap coverage. Following that second surgery, Dr. Person wrote orders transferring Smith from SICU to a ward bed; Dr. Person did not order any deep vein thrombosis/pulmonary embolism (DVT/PE) prophylaxis. Later that evening, Smith developed chest pain and shortness of breath. He was treated with oxygen. The next morning, Dr. Person called in Dr. Timothy Osonma, an internist, to help treat Smith. Dr. Osonma ordered sequential EKGs and cardiac enzymes. The EKG was abnormal, showing tachycardia, right bundle branch block, and Q wave abnormalities. Dr. Osonma concluded that Smith's pain was musculoskeletal and ordered the oxygen to be stopped. The next day, November 28, 2006, Smith again had significantly low oxygen saturation and was placed on oxygen. On November 29, 2006, Smith developed severe chest pain and shortness of breath and then suffered a cardiopulmonary arrest and died. An autopsy showed that the cause of death was a pulmonary embolus.

**TIMELINESS OF REPORTS**

In his first issue, Dr. Osonma and IPC argue that the expert reports at issue were untimely served pursuant to section 74.351 of the Texas Civil Practice and Remedies Code. Section 74.351(a) provides that "[i]n a health care liability claim, a claimant shall, not later than the 120th day after the date the original petition was filed, serve on each party or the party's attorney one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted." TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (Vernon Supp. 2008).

On January 22, 2008, Smith filed her original petition naming as defendants Methodist Hospital, The Hand Center, P.A. d/b/a The Hand Center of San Antonio, and David W. Person, M.D. On April 3, 2008, Smith filed an amended petition adding Dr. Osonma and his employer, IPC, as defendants. On June 2, 2008, Smith served her expert reports on Dr. Osonma and IPC.

Counting from January 22, 2008, Dr. Osonma and IPC argue that the expert reports were untimely served. Smith responds that the reports were timely served because the 120-day period was not triggered by the filing of her original petition (which did not name Dr. Osonma and IPC as defendants) but by the filing of her amended petition on April 3, 2008, that is, the first petition naming Dr. Osonma and IPC as defendants. We agree with Smith.

Section 74.351(a)'s requirement that a plaintiff serve an expert report explaining each defendant physician's or health care provider's liability within 120 days from the filing of the original petition does not necessarily refer to the first-filed petition in the lawsuit; it refers to the first-filed petition naming that defendant physician or health care provider as a party to the lawsuit.

Further, we note that adopting Dr. Osonma and IPC's interpretation of the statute would lead to absurd results: after more than 120 days after filing a lawsuit, even if the statute of limitations period had not expired, a plaintiff could never add another physician or health care provider as a defendant because she would never be able to timely serve an expert report on such a defendant.

Finally, Dr. Osonma and IPC place much importance on the legislature's decision to amend section 74.351(a) by substituting "the original petition was filed" for "the claim was filed," arguing that the change in the phrase shows the legislature's intent to begin the 120-day period from the first-filed petition in the lawsuit, no matter whether the defendant was named in that petition. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) historical note (Vernon Supp. 2008). However, the bill analysis written by the Civil Practices Committee gave the following purpose for the bill amending section 74.351(a):

> Since the passage of H.B. 4 in the 78th Session, there has been some confusion regarding the timing of when an expert report is due on a medical malpractice case. Some have argued that the report is due 120 days from the date of the statutory notice letter, instead of 120 days from the date of the filing of the original petition. It was the intent of H.B. 4 that the report be triggered by the filing of the lawsuit.

House Comm. on Civil Practices, Bill Analysis, Tex. H.B. 2645, 79th Leg., R.S. (2005). Thus, it appears the legislature was concerned about arguments that the report would be due 120 days from the date of the statutory notice letter; we find no support for Dr. Osonma and IPC's argument that in amending section 74.351(a), the legislature sought to clarify that the 120-day period was triggered by the first-filed petition, even if the defendant physician or health care provider was not named as a party in that first-filed petition.

Therefore, because the expert reports were served on Dr. Osonma and IPC within 120 days of the filing of the amended petition, the first petition to name Dr. Osonma and IPC as defendants, we hold that the expert reports were timely served.

### ADEQUACY OF REPORTS

Dr. Osonma and IPC also argue that the expert reports served on them were inadequate because they (1) lump together the standard of care for Dr. Person and Dr. Osonma; (2) fail to state how Dr. Osonma breached the standard of care; and (3) are conclusory with respect to causation. We disagree and conclude the trial court could have found that the report authored by Dr. Jeffery M. Krakower was adequate.[1]

When considering a motion to dismiss under section 74.351, "the issue for the trial court is whether the report represents a good faith effort to comply with the statutory definition of an expert report." *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l) (Vernon Supp. 2008). A report need not marshal all the plaintiff's proof. *Palacios*, 46 S.W.3d at 878. To constitute a "good faith effort," the report must provide enough information to (1) inform the defendant of the specific conduct the plaintiff has called into question, and (2) provide a basis for the trial court to conclude that the claims have merit. *Id.* at 879. "When a plaintiff sues more than one defendant, the expert report must set forth the standard of care applicable to each defendant and explain the causal relationship between each defendant's individual acts and the injury." *Sanjar v. Turner*, 252 S.W.3d 460, 465 (Tex. App.—Houston [14th Dist.] 2008, no pet.); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a), (r)(6) (Vernon Supp. 2008). We review the trial court's decision on the adequacy of a

---

[1] Because we hold that Dr. Krakower's expert report was adequate, we need not consider whether the other report served on Dr. Osonma, one authored by Dr. Brian Camazine, was adequate.

report for abuse of discretion. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002); *Palacios*, 46 S.W.3d at 877-78.

Dr. Osonma and IPC argue that Dr. Krakower's expert report is inadequate as to standard of care because Dr. Krakower lumps together the standard of care for Dr. Person and Dr. Osonma. We disagree. The expert report states the following with respect to the standard of care for the attending and consulting physicians:

> (1) The standard of care requires that the attending and consulting physicians initiate effective prophylaxis for deep venous thrombosis and pulmonary embolism according to evidence based guidelines which are widely available. A compilation of such guidelines can be found in the *Seventh ACCP Conference on Antithrombotic and Thrombolytic Therapy: Evidence Based Guidelines*. Mr. Smith underwent two major surgical procedures and was >40 years of age. He thus would be at substantial risk for development of deep venous thrombosis and pulmonary embolism and required effective prophylaxis against these events.

> (2) The above guidelines notwithstanding, Southwest Texas Methodist Hospital had hospital guidelines regarding deep venous thrombosis and pulmonary embolism prophylaxis in surgical and critical care unit patients. The standard of care required that Mr. Smith's physicians either follow hospital guidelines, document an effective alternative prophylatic program, or document why such guidelines were not appropriate for Mr. Smith.

> (3) The standard of care required the attending and consulting physicians to recognize the possibility of post-operative deep venous thrombosis and pulmonary embolism in a patient at risk for these disorders and initiate appropriate diagnostic studies to objectively diagnosis or exclude these conditions.

> (4) The standard of care required the attending and consulting physicians to fully evaluate the cause of Mr. Smith's oxygen desaturation, chest pain, and shortness of breath including the possibility of pulmonary embolism.

The language in the report clearly states a standard of care for the "attending physician" and the "consulting physician." The report states that Dr. Person performed the following acts relating to Smith's care:

(1) On November 25th, Dr. Person performed the re-implantation surgery.

(2) On the night of November 26th, Dr. Person scheduled revision amputation surgery.

(3) On the morning of November 27th, Dr. Person ordered the heparin to be stopped.

(4) On November 27th, Dr. Person performed the subsequent amputation surgery.

(5) On November 27th, Dr. Person ordered Smith to be transferred from the Surgical Intensive Care Unit to a ward bed.

(6) When Smith became hypoxemic at 1:10 a.m. on November 28th, Dr. Person ordered Smith to be given oxygen.

(7) At 8:15 a.m. on November 28th, Dr. Person called on Dr. Osonma to work up Smith's shortness of breath.

(8) At 7:45 a.m. on November 29th, Dr. Person evaluated Smith and noted that he was to remain in the hospital due to decreased oxygen saturation.

Thus, it is apparent from the expert report that the expert considered Dr. Person to be an "attending physician" in this case.

Further, the report states that Dr. Person "noted that hospitalist Dr. Osonma would work up the shortness of breath with cardiac enzymes and an EKG." The report then states that Dr. Osonma did the following:

> Dr. Osonma ordered cardiac enzymes and EKG at 0820 hours with both tests to be repeated six hours thereafter. The EKG showed sinus tachycardia and right bundle branch block with non-specific ST and T wave changes. The EKG reader noted that there was no prior EKG available for comparison. Cardiac enzymes were normal. Dr. Osonma noted that Mr. Smith had a very brief episode of right sided chest pain, which felt like a muscle strain and was similar to what Mr. Smith experienced when working out. Dr. Osonma did not note any history of shortness of breath. Dr. Osonma recorded an assessment of musculoskeletal chest pain and ordered oxygen to be discontinued.

Thus, it is apparent from the expert report that the expert considered Dr. Osonma to be a "consulting physician" in this case.

It is of no significance that the expert opines that the standard is the same for both, particularly given that both doctors in this case treated the same patient for the same condition. *See Sanjar*, 252 S.W.3d at 466 (concluding that grouping the defendant doctors together under the relevant standard of care for each condition did not render the report inadequate because report stated that all defendant doctors participated in treating and monitoring the patient's condition); *Romero v. Lieberman*, 232 S.W.3d 385, 391-92 (Tex. App.—Dallas 2007, no pet.) (holding that "one size fits all" standard of care was sufficient because report stated all three doctors participated in treating patient's condition); *In re Boone*, 223 S.W.3d 398, 405-06 (Tex. App.—Amarillo 2006, orig. proceeding) (holding report that stated single standard of care sufficient because report stated that doctors and physician's assistant were all involved in administration of patient's post-operative anti-coagulation therapy).

We note that Dr. Osonma and IPC cite several cases in support of their argument that an expert report cannot group multiple defendants in the same standard of care. *See Gray v. CHCA Bayshore*, 189 S.W.3d 855 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *Taylor v. Christus Spohn Health Sys. Corp.*, 169 S.W.3d 241, 246 (Tex. App.—Corpus Christi 2004, no pet.); *Doades v. Syed*, 94 S.W.3d 664, 672 (Tex. App.—San Antonio 2002, no pet.). However, those cases are distinguishable from the facts presented here. In *Gray*, 189 S.W.3d at 859, the First Court of Appeals held that an expert report was not adequate because it stated without explanation that a single standard of care applied to a doctor and a nurse. The court noted that "[w]hile it is possible that an identical standard of care regarding limb monitoring during and after surgery attaches to an anesthesiologist (Dr. Rapp) and a perioperative nursing staff (Bayshore), such generic statements, without more, can reasonably

be deemed conclusory." *Id.* Here, however, it is clear from reading the expert report that the expert considered both Dr. Person and Dr. Osonma as treating doctors with respect to the same condition.

Similarly, in *Taylor*, 169 S.W.3d at 244-45, the Thirteenth Court of Appeals held a report was inadequate because it grouped the standard of care for an ER physician, a hospital, and a cardiologist and in a conclusory fashion stated that the standard of care required effective communication between the various health care providers. Likewise, in *Doades*, 94 S.W.3d at 668-72, this Court held the expert report was inadequate because it grouped the standard of care for a doctor and a hospital nurse and contained "mere conclusions regarding breach and causation." Both *Taylor* and *Doades* are distinguishable. As noted, here, it is apparent that the expert considered both Dr. Person and Dr. Osonma to be treating doctors as to the same condition. Thus, the expert report was not conclusory in stating exactly what standard of care applied to both doctors.

Finally, we note that while the cases cited by Dr. Osonma and IPC state that an expert report must state a standard of care for each defendant, nothing in them states that a report cannot apply the same standard of care to more than one physician if, as here, in the expert's opinion, they all owed the same duty to the patient. *Sanjar*, 252 S.W.3d at 467.

Dr. Osonma and IPC also argue that Dr. Krakower's expert report fails to state how Dr. Osonma breached the standard of care and is conclusory with respect to causation. We disagree. Dr. Krakower's report states the following with respect to breach of the standard of care and causation:

> (1) Dr. Osonma "breached the standard of care by failing to provide prophylaxis against deep venous thrombosis and pulmonary embolism in accordance with evidence based on guidelines and in accordance with hospital policies. If appropriate prophylaxis had been provided and maintained, then Mr. Smith, to a reasonable degree of medical probability, would not have suffered a pulmonary embolism and expired."

(2) Dr. Osonma breached the standard of care in "failing to adequately evaluate the cause of Mr. Smith's hypoxemia, chest pain, and shortness of breath." Specifically, Dr. Osonma "failed to initiate appropriate diagnostic studies to confirm or exclude the diagnosis of pulmonary embolism in a post-operative patient at risk for this disorder. Diagnostic tests for pulmonary embolism, including CT pulmonary angiography, are readily available, and can reliably diagnose or exclude pulmonary embolism while simultaneously providing information regarding alternative causes of pulmonary dysfunction. Had appropriate diagnostic studies been performed in a timely fashion to evaluate for the presence of pulmonary embolism, then, to a reasonable degree of medical certainty, pulmonary embolism would have been discovered and treated and Mr. Smith's arrest and death prevented.

We conclude that the expert report sufficiently states how Dr. Osonma breached the standard of care and is not conclusory with respect to causation.

We, therefore, hold that the trial court did not abuse its discretion in finding Dr. Krakower's report to be adequate and affirm the trial court's order.

Karen Angelini, Justice