Opinion filed November 29,
2012

 

                                                                       In The

                                                                              

  Eleventh
Court of Appeals

                                                                   __________

 

                                                         No. 11-11-00097-CV

                                                    __________

 

        ABILENE REGIONAL
MEDICAL CENTER, DEBBIE MARSH, 

              APRIL
NICHOLS, AND TARENA SISK, Appellants

 

                                                             V.

 

         ADANELICA ALLEN AND
DAVID ALLEN, INDIVIDUALLY 

          AND AS NEXT
FRIENDS OF MADISON ALLEN, Appellees



 

                                   On
Appeal from the 259th District Court

 

                                                             Jones
County, Texas

 

                                                     Trial
Court Cause No. 022317

 



 

                                                                  O
P I N I O N

            This interlocutory appeal involves a health care liability claim brought by appellees,
Adanelica and David Allen, individually and as next friends of Madison Allen,
their two-year-old daughter, against appellants, Abilene Regional Medical
Center and nurses Debbie Marsh, April Nichols, and Tarena Sisk.  Appellants
appeal the trial court’s order denying their motion to dismiss.  See Tex. Civ. Prac. & Rem. Code Ann. §
74.351 (West 2011).  We affirm in part and reverse and remand in part.  

Background
Facts

            Appellees’
health care liability claim arises from the events occurring prior to the birth
of Madison with respect to Adanelica’s course of labor at Abilene Regional. 
Appellees allege in their pleadings that Marsh, Nichols, and Sisk were labor
and delivery nurses at Abilene Regional who cared for Adanelica when she
presented to the hospital for induction of labor on August 18, 2008.  Appellees’
brought suit against Marsh, Nichols, and Sisk, alleging that they were
negligent in their care and treatment of Adanelica.  Appellees contend that the
nurses failed to recognize signs and symptoms indicating that Madison was in
respiratory distress.  They allege that Madison suffered permanent brain damage
as a result because the attending physician, Dr. Stanley, was not timely
advised of her diminishing condition so that he could implement appropriate
intervention.[1] 
Appellees also sued Abilene Regional, asserting that it is vicariously liable
for the alleged negligence of Marsh, Nichols, and Sisk.   Appellees
additionally asserted that Abilene Regional is directly liable to them “for not
ensuring that it staffed the labor and delivery unit with nurses who [sic]
sufficient experience for this highly specialized care.”

            Appellees
attached the expert reports of Dr. Ezell Autrey, M.D.; Joan Dauphinee, R.N.;
and Dr. Robert A. Zimmerman, M.D. to their original petition in order to comply
with the expert report requirements of Section 74.351(a).  Appellants filed an
objection to all three of the initial reports, which the trial court subsequently
overruled in a written order.  Appellees later filed a “Life Care Plan”
prepared by Dr. Joe G. Gonzales, M.D., which appellants also challenged.[2] 
Appellants subsequently filed a motion to dismiss the action based upon the
sufficiency of the expert reports.  This appeal arises from the trial court’s
denial of appellants’ motion to dismiss.

Standard
of Review

We
review a trial court’s decision to deny a motion to dismiss under Section
74.351(b) for an abuse of discretion.  Bowie Mem’l Hosp. v. Wright, 79
S.W.3d 48, 52 (Tex. 2002); Hendrick Med. Ctr. v. Conger, 298 S.W.3d 784,
787 (Tex. App.—Eastland 2009, no pet.).  To determine whether a trial court
abused its discretion, we must decide whether the trial court acted in an
unreasonable or arbitrary manner without reference to any guiding rules or
principles. Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241–42
(Tex. 1985).

A
trial court must “grant a motion challenging the adequacy of an expert report
only if it appears to the court, after hearing, that the report does not
represent an objective good faith effort to comply with the definition of an
expert report.”  Section 74.351(l).  The statutory definition requires
that the expert report provide a fair summary of the expert’s opinion regarding
the applicable standard of care, the manner in which the care rendered failed
to meet that standard, and the causal relationship between the failure to meet
the standard of care and the injury suffered.  Id. § 74.351(r)(6).  A
report must be served as to each physician or health care provider against whom
a liability claim is asserted.  Id. § 74.351(a).  However, a plaintiff
may serve multiple reports by separate experts regarding different defendants,
different claims, and different issues, as long as the reports, read together,
provide a fair summary of the standard of care, breach, and causation.  Id.
§ 74.351(i), (r)(6); see also Packard v. Guerra, 252 S.W.3d 511, 526
(Tex. App.—Houston [14th Dist.] 2008, pet. denied) (“[S]ection 74.351(i) does
not require that a single expert address all liability and causation issues
with respect to a defendant.”); Martin v. Abilene Reg’l Med. Ctr., No.
11-04-00303-CV, 2006 WL 241509, at *4 (Tex. App.—Eastland Feb. 2, 2006, no
pet.) (mem. op.) (“Section 74.351(i) expressly provides that a claimant may
satisfy any requirement of the Act by providing reports of separate experts.”).

            A “good
faith effort” under Section 74.351(l) “simply means a report that does
not contain a material deficiency.”  Samlowski v. Wooten, 332 S.W.3d
404, 409–10 (Tex. 2011).  If the report fulfills its two purposes, it
represents a good faith effort.  See Am. Transitional Care Ctrs. of Tex.,
Inc. v. Palacios, 46 S.W.3d 873, 879 (Tex. 2001) (“In setting out the
expert’s opinions on each of those elements, the report must provide enough
information to fulfill two purposes if it is to constitute a good-faith effort.”). 
The two purposes of the expert report are to inform the defendant of the
specific conduct the plaintiff has called into question and to provide a basis
for the trial court to conclude that the claims have merit.  Leland v.
Brandal, 257 S.W.3d 204, 206–07 (Tex. 2008) (citing Palacios, 46
S.W.3d at 879).  “In contrast, a report that omits an element or states the
expert’s opinions in conclusory form is not a good faith effort.”  Samlowski,
332 S.W.3d at 410 (citing Palacios, 46 S.W.3d at 879).

Issues

Appellants
present three issues on appeal.  In their first issue, they argue that the
trial court abused its discretion when it determined that appellees filed
sufficient expert reports based upon appellants’ assertion that the reports did
not satisfy the causal relationship requirement.  See Section
74.351(r)(6).  Appellants assert in their second issue that the expert reports
failed to address appellees’ direct liability claims against Abilene Regional. 
In their third issue, appellants contend that the expert reports are deficient
because they failed to distinguish the alleged acts and omissions of each appellant
separately.   

Expert
Reports

            A.  Dr.
Autrey’s Report

            Appellees
primarily rely upon the report of Dr. Autrey to satisfy the expert report requirement. 
Dr. Autrey stated in his report that he is a board-certified obstetrician/gynecologist
that has been practicing in the field for the past twenty-six years.  He stated
that he has managed patients that have been given Cytotec for cervical ripening
followed by Pitocin for induction of labor.  He further stated that he has attended
“hundreds of deliveries” and that he is “familiar with the biological mechanism
by which a fetus suffers brain injury when deprived of oxygen.”  Dr. Autrey
also stated that he is aware of what a labor and delivery nurse should do when
she has a patient with Cytotec for cervical ripening, Pitocin induction, and
fetal distress.  

            Dr.
Autrey initially detailed the treatment provided to Adanelica in the labor and
delivery unit of Abilene Regional.  She arrived at 10:10 p.m. on August 18, 2008,
for the induction of labor.  Dr. Stanley placed her initial administration of Cytotec
at 10:48 p.m.  Dr. Autrey stated that Sisk performed all subsequent Cytotec
administrations.  Dr. Autrey noted that Dr. Stanley ruptured Adanelica’s
membranes at 8:28 a.m. the next morning.  Marsh started IV Pitocin at 8:40 a.m.
and assumed care of Adanelica after Sisk.  Marsh subsequently increased the
administration of Pitocin.  Dr. Autrey noted that Nichols decreased the
administration of Pitocin at 12:23 p.m. due to signs of fetal distress.  Marsh
subsequently increased the administration of Pitocin until 2:38 p.m. when it
was discontinued due to “‘loss of capture’ and variable decelerations.”  Marsh
restarted Pitocin at 3:23 p.m.  

            Adanelica
progressed to complete dilation at 4:20 p.m., after which time Marsh increased
the administration of Pitocin.  At 5:13 p.m., Dr. Stanley discussed a Caesarean
section with Adanelica due to fetal distress.  Madison was delivered at 5:27
p.m. with a “nuchal cord times one.”[3] 
Dr. Autrey detailed that Madison took her first spontaneous breath at around
seven minutes and that she had seizures and apneic periods soon after arrival.

            Under
a section of his report labeled “TARENA SISK, R.N., DEBBIE MARSH, R.N. AND
APRIL NICHOLS, R.N.,” Dr. Autrey opined that the applicable standard of care
for labor and delivery nurses managing a patient receiving Cytotec for cervical
ripening followed by IV Pitocin for induction of labor requires them to do as
follows: (1) maintain a readable tracing of the fetal heart tones and
contraction pattern; (2) not start, increase, or continue Pitocin on a patient
with a non-reassuring fetal monitor tracing, no uterine contraction monitoring,
or uterine hyperstimulation; (3) notify the physician if there is a
non-reassuring fetal heart tones tracing; (4) discontinue Pitocin when
there is a non-reassuring fetal heart tones tracing; and (5) initiate
intrauterine resuscitation when a baby has non-reassuring fetal heart tones. 
Dr. Autrey further opined that the nurses breached each of the applicable
standards of care that he listed.  

            Dr.
Autrey then detailed instances when the various events he cited occurred.  He
noted that a readable tracing of uterine contractions was not present from
10:51 p.m. until 2:39 a.m.  He opined that a reasonable labor and delivery
nurse should be on heightened vigilance to ensure the fetus is receiving
adequate oxygen if a fetal monitor is not properly working.  He identified 9:45
a.m. to 10:03 a.m. as another period when the fetal heart rate was not being
properly traced.  Dr. Autrey also noted that Marsh increased Pitocin at 11:04
a.m. and 11:49 a.m. even though there were non-reassuring fetal heart tones. 
Dr. Autrey stated that, “[a]t no time was Dr. Stanley notified of these
non-reassuring fetal heart tones or of the poor non-readable fetal heart tones
and contraction pattern.”  He further stated that the nurses’ deviations from
the applicable standard of care “were the direct and proximate cause” of the
injuries to Madison, including metabolic acidosis, seizure, severe hypoxic
ischemia, and permanent brain damage.

            Dr.
Autrey’s report then contained a section labeled “Abilene Regional Medical Center.”  He opined that the
standard of care for a reasonable prudent hospital is to ensure that its labor
and delivery nurses abide by the applicable standards of care when managing a patient
receiving Cytotec for cervical ripening and then IV Pitocin for induction.  He
then essentially repeated the standards of care that he had previously
identified for the nurses and their alleged breaches of the applicable
standards of care.

            Near
the end of his report, Dr. Autrey stated as follows:

            Had the nurses apprised Dr. Stanley of the non-reassuring tracings earlier, this would
have alerted a reasonable and prudent OB/GYN to institute a Caesarean section
earlier than he did.  The multiple decelerations that baby Madison experienced,
combined with the lack of proper uterine contraction tracing the night before,
would have convinced a reasonable and prudent OB/GYN to perform a Caesarean
section before oxygen deprivation reached a brain-damaging level.

 

            Oxygen
is necessary for our cells to survive and function.  Without oxygen, cells
die.  Continued oxygen deprivation causes brain damage in fetuses as well as
adults.

 

            Upon
review of the fetal monitoring strips, the hypoxic ischemic encephalopathy
(brain damage to due to oxygen deprivation) this child suffered was a
culmination of multiple decelerations but the vast majority of the damage began
at or around [5:01 p.m.] through [5:27 p.m.] on 8/19/08.  This is based on the
drop of the baby’s heart rate to around 60-70 beats per minute at or around
[5:01 p.m.].  This is caused by umbilical cord compression denying oxygen to
the fetus, much as a situation in which a hardhat diver submerged in a body of
water had a prankster clamp his hand on the hose feeding him air.  Without
oxygen brain cells die, in a fetus or in a person outside the womb.  My
opinion, based on a reasonable degree of medical probability, is that the
permanent brain damage to this child began at or around [5:01 p.m.]. 
Obviously, had the child been taken from the womb by Caesarean section before [5:01
p.m.] this injury would not have occurred.  

 

            The
decelerations that had been occurring, had the doctor been informed of them,
would have alerted the physician that umbilical cord was obstructed in such a
position that it was not letting this oxygenated blood get to the fetus well. 
This obstruction is likened to a kink in a hose.  When the cord shifted such
that the obstruction got a little worse, the crash occurred at [5:01 p.m.].  Had
Dr. Stanley been armed with the knowledge of the prior decelerations by the
nurses, the standard of care dictates he would have performed a Caesarean
section several hours before the [5:01 p.m.] crash occurred.

 

            B. 
Dauphinee’s Report

Dauphinee
began her report by stating that she is a registered nurse in Florida and that
she has been a nurse for forty years.  She stated that she has worked in labor
and delivery units, published journal articles and textbooks in this area of
nursing, and lectured nationally on obstetrical topics.  Dauphinee further
stated that she is familiar with the standards of care for obstetrical nurses.

Dauphinee
noted that Adanelica was admitted to the labor and delivery unit by Sisk for
the induction of labor.  Dauphinee also described the roles of Cytotec and
Pitocin in inducing labor.  She stated that Pitocin is usually controlled by
the nurse.  Pitocin is increased to increase contractions and decreased or
stopped if the contractions get too strong, long, or close together, which
might decrease oxygen to the baby.  Dauphinee stated that the manner in which
Pitocin is adjusted is based on whether or not “the tracing is reassuring or
non-reassuring.”  She further stated that Pitocin should only be continued or
increased if the tracing is reassuring and that it should be discontinued with
non-reassuring fetal monitoring tracing.

Dauphinee’s
report continues with a review of the medical records.  She noted that, “[d]uring
the night while under the care of Sisk the fetal monitor was not tracing
contractions well.”  Dauphinee noted that the tocotransducer that identifies
the beginning and the end of contractions was not working from 10:51 p.m. to
1:43 a.m.  She stated that it is very important for this instrument to be
working to record contractions during the administration of a labor induction
agent so that the nurse can be certain that there is not too much uterine
activity.  Dauphinee indicated that non-reassuring tracings occurred between
1:44 a.m. and 2:19 a.m., from 2:39 a.m. to 4:29 a.m., from 5:20 a.m. to 6:18
a.m., and from 6:27 a.m. to 8:11 a.m.

Dauphinee
noted that Marsh took over care of Adanelica at 8:40 a.m. until delivery.  Marsh
started Pitocin at that time.  Dauphinee indicated that Marsh increased the
dosage of Pitocin at 9:17 a.m. even though there were “late decelerations with
decreased variability.”  Dauphinee noted that Pitocin was later increased at
11:04 a.m. and 11:49 a.m. “even though the tracing was non-reassuring.”  She
then noted that the dosage of Pitocin was decreased at 12:23 p.m. by
Nichols as a result of the fetal monitor tracing.  Dauphinee further noted that
this was the only entry in the medical records made by Nichols.  Pitocin was
discontinued at 2:38 p.m. due to “‘loss of capture’ and variable
decelerations.”  Pitocin was restarted at 2:46 p.m., increased at 4:01
p.m., and never stopped, “even with an ominous tracing.” 

Dauphinee
concluded her report by listing the following alleged breaches of the applicable
standard of care for labor and delivery nurses:

Not maintaining a
readable tracing (Nurse Sisk and Nurse Marsh)

Not maintaining a
readable tracing with a non-reassuring fetal monitoring tracing (Nurse Sisk and
Nurse Marsh)

Not maintaining a
readable contraction pattern, especially with administration of pitocin and/or
cytotec (Nurse Sisk and Nurse Marsh)

Not decreasing
pitocin with a non-reassuring fetal monitoring tracing (Nurse Marsh)

Not discontinuing
pitocin with a non-reassuring fetal monitoring tracing (Nurse Marsh and Nurse
Nichols)

Increasing pitocin
with a non-reassuring fetal monitoring tracing (Nurse Marsh)

Not notifying the
physician of non-reassuring fetal monitoring tracings [(]Nurse Sisk and Nurse
Marsh)




 

Not notifying the
physician of inability to maintain a continuous tracing (Nurse Sisk, Nurse
Nichols and Nurse Marsh)

Not placing this
newborn on monitors after resuscitation at delivery.

 

            C. 
Dr. Zimmerman’s Report

Dr.
Zimmerman notes in his report that he is the chief of pediatric neuroradiology
at The Children’s Hospital of Philadelphia.  Compared to Dr. Autrey’s report
and Dauphinee’s report, Dr. Zimmerman’s report is quite brief.  He briefly
commented on his findings from two ultrasound examinations and an MRI.  He then
summarized his findings as follows: “The MRI is the most important study,
showing the characteristic findings of profound asphyxia, which are consistent
with bradycardic events occurring in the pre-delivery period.  These are not a
manifestation of a strep infection, unless the strep infection were to cause an
acute cardiovascular collapse in the infant.”

Causal
Relationship

Appellants
present three sub-issues in support of their contention that the expert reports
do not sufficiently address the causal relationship requirement.  Specifically,
appellants contend: (1) the reports of Dr. Zimmerman, Dr. Gonzales, and
Dauphinee do not address the required element of causal relationship; (2) Dr.
Autrey is unqualified to opine as to causal relationship in this case; and (3) Dr.
Autrey’s opinions regarding causal relationship are conclusory, hinge upon
unsubstantiated assumptions, and conflict with the other expert reports.  

We
first examine the sub-issue concerning Dr. Autrey’s qualifications to offer an
opinion concerning causal relationship.  Appellants contend that he is not
qualified to offer an opinion on causal relationship because he is not a
neurologist or a pediatric neuroradiologist.  They further assert that “[n]either
the report nor curriculum vitae of Dr. Autrey demonstrate his competence or
qualifications to testify on the cause or timing of neurological injuries
allegedly suffered by Madison Allen during labor and delivery.”  We disagree.

In
Livingston v. Montgomery, 279 S.W.3d 868, 869 (Tex. App.—Dallas, 2009,
no pet.), an obstetrician/gynecologist provided an expert report pertaining to
neurological injuries that a baby allegedly suffered during labor and
delivery.  In addressing a challenge to the obstetrician/gynecologist’s
qualifications to offer an opinion on causation, the court of appeals focused
on the question of whether he, as a non-neurologist, was qualified under the
statute to provide an expert report on the cause of neurological injuries.  279
S.W.3d at 876.  The court concluded that the obstetrician/gynecologist’s
expertise in managing labor and delivery qualified him to opine on the causal
relationship between labor and delivery and the complications that stem from
labor and delivery, including a newborn’s neurological injuries.  Id. at
877.  In reaching this holding, the court noted that the causation issue in the
case related to the duty of health care providers to recognize potential harm
and take appropriate actions.  Id.

The
alleged acts of negligence in Livingston are quite similar to those
alleged in this appeal.  Furthermore, this appeal also involves a causation
issue pertaining to complications arising from labor and delivery.  Appellants
assert that Livingston is distinguishable because the
obstetrician/gynecologist included the following statement in his expert report
pertaining to his qualifications:  

            Although
I am not a neurologist, as an obstetrician I have knowledge and expertise to recognize
the perinatal progression of hypoxia due to inadequate oxygenation through a
compromised uteroplacental unit—either because of uteroplacental insufficiency
or inadequate refractory periods between contractions or both; I have knowledge
and expertise on the subject of hypoxia as it relates to the associated build up
of carbon dioxide (hypercapnia) that complicates ischemia and which makes the
unborn infant at risk for a rebound brain perfusion that results in perinatal neurological
brain injury. 

 

Id. at
874.  We disagree.  While Dr. Autrey did not include as detailed of a description
of his qualifications on causation, he stated that he is “familiar with the
biological mechanism by which a fetus suffers brain injury when deprived of
oxygen.”   He supported this statement by noting that he had attended “hundreds
of deliveries.”  As was the case in Livingston, the trial court did not
abuse its discretion in determining that Dr. Autrey’s report contained a
sufficient statement of his qualifications to offer his opinion on the causal
relationship between labor and delivery and the complications that stem from
labor and delivery, including a newborn’s neurological injuries.  

            Appellants
also argue that Dr. Autrey’s opinion on causation is insufficient.  Among other
things, they contend that his opinion is conclusory and speculative.  Autrey opines
that, had the nurses reported negative findings to Dr. Stanley earlier, he
would have performed a Caesarean section sooner thereby avoiding the severe
crash that began at 5:01 p.m.  Appellants contend that Dr. Autrey’s opinion to
the effect that Dr. Stanley would have performed a Caesarean section earlier is
pure speculation and thereby conclusory.  We disagree.  We addressed a similar
situation in Martin.  The claimant in Martin alleged that a hospital
nurse was negligent in failing to inform the treating physician of his failure
to prescribe a necessary medication to a heart patient at discharge.  2006 WL
241509, at *4–5.  We held that the expert reports in Martin were
sufficient because they identified what the treating physician should have done
if he had been armed with the correct information.   The reasoning in Martin
is applicable to Dr. Autrey’s report.  His report constitutes a good faith
effort to provide a fair summary of causation because he identifies what a
reasonable and prudent obstetrician would have done if he had been provided the
correct information.  

            Appellants
additionally contend that Dr. Autrey’s opinion on causation is insufficient
because it refers to the nurses’ conduct collectively rather than separately
identifying their acts and omissions.  Appellants also present this contention
in their third issue when addressing the expert reports’ allegations of the
negligent acts of the nurses and Abilene Regional.  We will address the
contention in our consideration of appellants’ third issue.

            Appellants
additionally contend that Dr. Autrey’s opinion on causation is insufficient
because it conflicts with matters contained in other expert reports and the
facts in the case.   The inquiry at the report stage focuses on whether the
information within the four corners of the report meets the good faith
requirement of the statute.  Palacios, 46 S.W.3d at 878–79; Schrapps v.
Lam Pham, No. 09-12-00080-CV, 2012 WL 4017768, at *3 (Tex. App.—Beaumont
Sept. 13, 2012, no pet. h.) (mem. op.).  If the facts do not support a
plaintiff’s claim, summary judgment procedures provide a remedy.  See Tex. R. Civ. P. 166a; Shcrapps,
2012 WL 4017768, at *3.

            Having
found Dr. Autrey’s opinion on causation sufficient, we need not address
appellants’ contentions pertaining to the other expert reports on the matter of
causation.  Appellants’ first issue is overruled.

Direct
Liability vs. Vicarious Liability

            In
their second issue, appellants contend that the expert reports do not
adequately address appellees’ direct liability claim against Abilene Regional. 
We begin our analysis by addressing appellees’ counterargument.  Citing Certified
EMS, Inc. v. Potts, 355 S.W.3d 683 (Tex. App.—Houston [1st Dist.] 2011,
pet. granted), appellees contend that their expert reports are not required to
support every theory of liability asserted as long as at least one theory is
adequately supported.  We recently addressed this issue in Hendrick Medical
Center v. Miller, No. 11-11-00141-CV, 2012 WL 314062 (Tex. App.—Eastland
Jan. 26, 2012, no pet.) (mem. op.).  In Miller, we expressly declined to
follow the holding in Potts.  Id. at *3.   For the reasons
expressed in Miller, we reaffirm our holding that direct liability and
vicarious liability claims must be separately evaluated to determine whether
each claim is supported by a sufficient expert report.   

            Appellees’
petition included a direct liability claim against Abilene Regional that reads
in its entirety as follows:

DIRECT
LIABILITY OF DEFENDANT

ABILENE
REGIONAL MEDICAL CENTER

 

            Additionally,
Abilene Regional Medical Center is liable for not ensuring that it staffed the
labor and delivery unit with nurses who [sic] sufficient experience for this
highly specialized care.  Abilene Regional placed Debbie Marsh on the labor and
delivery unit even though she lacked the requisite skill and experience to care
for Adanelica and Madison, which proximately resulted in the injuries to
Adanelica and Madison.  For this negligence, Abilene Regional Medical Center is
liable. 

 

Appellees’
direct liability claim appears to include elements of negligent hiring,
negligent training, and negligent supervision claims as they pertain to Marsh.  Dr.
Autrey references these claims to some extent by opining that Abilene Regional
did not ensure that its labor and delivery nurses abided by the applicable
standards of care when managing a patient receiving Cytotec for cervical
ripening and then IV Pitocin for induction.  However, the expert reports do not
contain any reference to Marsh’s educational background and do not provide any
insight on Abilene Regional’s staff training, policies, or procedures.  See
TTHR Ltd. P’ship v. Moreno, No. 02-10-00334-CV, 2011 WL 2651813, at *3
(Tex. App.—Fort Worth July 7, 2011, pet. granted) (mem. op.).  Thus, the
reports are deficient with regard to Abilene Regional’s direct liability. 
Appellants’ second issue is sustained in part.

            Section
74.351(c) provides that, if a report is considered not to have been served
because elements of the report are found deficient, the court may grant one thirty-day
extension to the claimant in order to cure the deficiency.  In light of the
trial court’s determination that the reports were not deficient, it has not
considered whether appellees should be granted an extension to cure their
reports’ deficiencies regarding the direct liability claim against Abilene
Regional or whether it should dismiss the claim.  See Moreno,
2011 WL 2651813, at *5.  Accordingly, we remand the case so that the trial
court has the opportunity to determine whether appellees should be granted a
thirty-day extension to cure what we have held to be deficient.  See Leland,
257 S.W.3d at 207 (noting that every court of appeals that has addressed a
deficient report has remanded the case to the trial court for the trial court
to determine whether to grant an extension); Moreno, 2011 WL 2651813, at
*5.

Specificity
of Reports as to Each Nurse

Appellants
assert in their third issue that the expert reports do not sufficiently specify
the particular alleged acts of negligence with respect to each of the nurses.  Dr.
Autrey references each of the nurses by name in his report, primarily from a
chronological perspective in their treatment of Adanelica during her labor and
delivery.  He devoted the bulk of his report to the actions of Marsh.  As we
noted in Martin, Section 74.351(i) expressly provides that a claimant
may satisfy any requirement of Section 74.351 by providing reports of separate
experts.  2006 WL 241509, at *4.  Dauphinee went into greater detail in her
report in addressing the care and treatment of Adanelica by the nurses.  As
quoted above, Dauphinee alleged approximately ten negligent acts or omissions that
she attributed to one or more of the nurses by parenthetical reference.  We conclude
that, when read together, the reports of Dr. Autrey and Dauphinee constitute a
good faith effort to differentiate the alleged negligent acts of the nurses. 
Appellants’ third issue is overruled.

This
Court’s Ruling

We
affirm the trial court’s order denying appellants’ motion to dismiss with
respect to appellees’ claims against the nurses individually and their
vicarious liability claims against Abilene Regional.  We reverse the trial
court’s order denying appellants’ motion to dismiss as to the direct liability
claim against Abilene Regional, and we remand this case to the trial court for further
proceedings consistent with this opinion, including a determination of whether
appellees should be granted a thirty-day extension to cure what we have held to
be deficient with regard to their direct liability claim against Abilene
Regional.

 

 

                                                                                                TERRY
McCALL

                                                                                                JUSTICE

November 29, 2012

Panel consists of: Wright, C.J.,

McCall, J., and Gray, C.J., 10th
Court of Appeals.[4]









[1]Appellees did not file suit against Dr. Stanley. 

 





[2]In light of appellees’ assertion that they are not
relying on Dr. Gonzales’s life care plan to satisfy the expert report
requirements, we do not address it in depth in this opinion.





[3]Dauphinee noted in her expert report that a “nuchal
cord” describes a situation when the umbilical cord is wrapped around the
baby’s neck.





[4]Tom Gray, Chief Justice, Court of Appeals, 10th
District of Texas at Waco, sitting by assignment to the 11th Court of Appeals.